## BONDS ISSUED FOR CHANGE OF GRADE CROSSINGS.

[Common Pleas Court of Franklin County.]

THE STATE OF OHIO, EX REL M. E. THRAILKILL, V. Z. E. AMLIN
ET AL.

Decided, April 23, 1903.

*Bonds—Issued by County Commissioners—For Bridging Dangerous
Railway Crossings—Not Issued in Same Denomination as Adver-
tised—Statute Authorizing Issue Not Mentioned in Advertisement
—Parties Dealing With Public Boards Must See That They are
Acting Within Their Authority—Sections 3337-8 to 17—Providing
for Abolishment of Grade Crossings—Publication of Resolution—
Submission of Question to People—Contract Between Commis-
sioners and Railways.*

1. Bonds issued by county commissioners, for the purpose of bridging
over dangerous railway crossings, are not rendered invalid by
reason of the fact that they were advertised and sold in denomi-
nations exceeding $1,000, where they were issued as required by law
in denominations not exceeding $1,000 or less than $50, and it does
not appear that the bonds would have sold for a better price had
they been advertised in the same denominations in which they
were issued.

2. The omission in an advertisement for the sale of such bonds to
mention the statute authorizing the issue is not, standing alone,
such an irregularity as would afford ground for declaring them
void, where the action is delayed until after their sale and de-
livery and circulation among innocent holders.

3. Where the cost of a structure intended to carry the street traffic
over a railway is divided up between the companies using the
tracks, the street railway company which is to use the structure,
and the county, and the cost apportioned to the county is not
shown to exceed $10,000, an injunction against the issue of bonds
for payment of the county's share will not lie on the ground
that the proposition was not submitted to a vote of the people.

4. Section 2824, having reference to the levy of a special tax for the
restoration of a county bridge, applies to bridges maintained
solely by the county, and has no application to a bridge where
the cost of erection and maintenance is apportioned between the
county and other parties in interest.

5. Such a structure must be built under the provisions of Section
3337-8 to 17, which is complete in itself, and permits county com-
missioners to contract with railway companies with reference to

a division of the cost, and issue bonds therefor, without reference to the emergency bridge fund, or the fact that there is not in the county treasury or in process of collection sufficient funds to meet the expense.

6. The provision of the statute that the railroad companies shall pay not less than 65 per cent. of the cost is complied with where the railroad companies pay less than 65 per cent., but the contribution of the railroad companies and the street car company taken together amounts to 80 per cent. of the cost.

EVANS, J.

This case is submitted on the petition of the plaintiff, the answer of the parties defendant, the evidence, exhibits, and arguments of counsel.

The petition sets forth five separate and distinct causes of action. The second cause of action having heretofore been dismissed by the plaintiff, and the contract in the fifth cause of action having been reconsidered and abandoned by the commissioners, said second and fifth causes of action are not before me for consideration. The first, third and fourth causes of action are here submitted on this hearing.

A statement of the facts in this case is embodied in the opinion.

The plaintiff by his first cause of action seeks to enjoin payment of interest and principal of $70,000 of emergency bridge bonds heretofore sold and issued by the commissioners of Franklin county.

The plaintiff complains that the board of commissioners failed to comply with certain essential requirements of the statutes in the preliminary steps, and acted contrary to law in advertising, issuing and delivering said bonds.

I have carefully examined into all the proceedings of the commissioners, as shown by the evidence and exhibits, but it will not be necessary here to review all their proceedings, and I will confine myself to such only as counsel for complainant has, in his argument, directed attention. The evidence shows that all the proceedings for this bond issue, the advertisement and sale thereof, the delivery and circulation of the same, were all performed and completed in the early part of the year 1902, and the money therefor placed in the county treasury, appropriated, and expended in part, if not altogether, for the sole purpose designated. On March 3

1902, the commissioners, as a part of their proceedings, adopted a resolution by a unanimous vote, levying under Section 2824, Revised Statutes, a special tax of eighty-five one-hundredths mills upon each dollar of taxable valuation of all taxable property in the county, for the restoration and building of the bridges and culverts specifically enumerated, and that such special tax be collected annually in such amounts as will meet the principal and interest of said bonds, hereinafter mentioned, and to be issued in anticipation of the collection of said special tax.

Said board further resolved that for the purpose of anticipating the collection of such special tax the sum of $70,000 be borrowed at a rate of interest not exceeding four per centum per annum, interest payable semi-annually; that under the provisions of Section 2824, Revised Statutes, four bonds of Franklin county, Ohio, for the aggregate sum of $70,000 be issued and sold for the purpose of raising the money necessary to restore and build said bridges and culverts. Said bonds to be due and payable as follows: All of said bonds dated April 1, 1902, each bearing interest as aforesaid, due in one, two, three and four years respectively, after date, three of said bonds for the sum of $20,000 each, and one of said bonds for the sum of $10,000.

Said board had theretofore, as a part of the preliminary steps, found and determined that it was necessary to rebuild and repair some fifty-one specified bridges and culverts in the county, which bridges and culverts were rendered unsafe by reason of floods and decay, and the county surveyor had been directed to, and did furnish all necessary plans and specifications therefor, and had estimated the cost thereof in the sum of $76,389.03. Said board of commissioners thereupon proceeded to and did advertise the sale of said bonds, as required by law, in the denominations as set forth in the aforesaid resolution. Said advertisement was in the usual form, and contained the requirements as provided in Section 22b, Revised Statutes, except that it failed to state the law or section of law authorizing the said bond issue, as required by said section of the statutes. Said advertisement, however, contained the proviso that the form of bonds will be made to suit purchasers, and also provided that bidders are required to be satisfied as to the legality of said bonds before bidding.

The Ohio National Bank being the highest bidder the bonds were on March 28, 1902, sold to said bank at a premium of $150. And on the following day, at a meeting of said board, said bid was accepted, and the board by a unanimous vote, adopted a resolution ordering that the denomination of said bonds be changed to read $1,000 each instead of $20,000 and $10,000 each. And said bonds were issued and delivered to said purchaser in denominations of $1,000 each.

The contention of the plaintiff is:

(1)  That the board of commissioners transcended the law in issuing said bonds in denominations of $1,000 each, after having advertised and sold the same in denominations of $20,000 and $10,000 each.

(2)  That the omission of the commissioners to state the law or the section of the law authorizing the issue of said bonds in their advertisement was material and invalidated said sale.

Counsel for plaintiff contends that, by reason of the above facts, said bonds should be held invalid and void, and that their payment should be enjoined, and that the special levy of taxes for the payment of the interest and principal thereof should be enjoined.

First.  Was the act of the board of county commissioners in changing the denomination of the bonds when issued, in violation of the law, and, if so, is it sufficient to invalidate the bonds? The sections of the statutes prescribing the manner of advertising, selling, and issuing of bonds are Section 22b and Section 872, Revised Statutes, and they must be construed together.

Section 22b provides that—

"All bonds issued by boards of county commissioners,  *  *  * shall be sold to the highest bidder after being advertised three times, weekly, in a newspaper having a general circulation in the county where the bonds are issued; and if the amount of bonds to be sold exceeds twenty thousand dollars, then in an additional newspaper having a general circulation in the state, three times, weekly. The advertisement shall state the total amount of bonds to be sold, the amount of each bond, how long they are to run, the rate of interest to be paid thereon, whether annually, or semi-annually, the law or section of law authorizing their issue, the day, hour and place in the county where they are to be sold. None of said bonds shall be sold for less than the face thereof, with any interest that

may have accrued thereon; and the privilege shall be reserved of rejecting all or any bids, and if said bids are rejected said bonds shall again be advertised; all moneys arising from premiums on the sale of said bonds, as well as the principal, shall be credited to the fund on account of which the bonds are issued and sold."

The above section of the statute does not attempt to limit or define in what denomination bonds shall be sold or issued. So far as advertising and selling the bonds is concerned it seems to leave to the discretion of the board.

Section 22*b* above, is the act of March 22, 1883. Preceding the passage of that act there seems to have been no uniform provision of law in detail for the manner of advertising the sale of bonds of this character, and its evident purpose was to specifically define the manner of advertising, to adopt uniformity and to do away with any laxity in the manner of advertising and selling bonds, of the character enumerated.

This section has nothing to do with fixing the denomination of bonds; that is provided for in another section of the statutes which was enacted in 1869, and is now known as Section 872, Revised Statutes.

This section provides that—

"The bonds so issued may be used to refund any bonds outstanding, which were issued for the purpose of purchasing the lands or erecting the buildings so acquired by the commissioners, and shall be signed by the commissioners, or any two of them, and countersigned by the auditor, with or without coupons attached, in sums not less than fifty nor more than one thousand dollars each, payable to bearer at the county treasury, with interest, as aforesaid, at such times, not exceeding twenty years after date, as the commissioners prescribe, and such bonds shall specify distinctly the object for which they were issued."

Section 871, Revised Statutes, provides for the purposes for which said board may borrow money, including, among other things, "any necessary buildings, or bridge, or for the purpose of enlarging, repairing, improving, or rebuilding any such buildings or bridge."

I think there is no doubt but that under the provisions of Section 872, Revised Statutes, the Legislature intended to and did fix a maximum and minimum limit in the amount and denomination of

bonds of this character. And the commissioners have recognized this limitation by issuing the bonds in question in the denomination of one thousand dollars each. Any issue of bonds in a denomination exceeding one thousand dollars each would clearly have been in direct violation of that act.

But I do not find that any of the legislative acts in question require that the bonds shall be advertised and sold in the amounts and denominations in which they are issued. So far as those statutes provide the commissioners may advertise and sell the bonds in certain specified amounts and denominations, and issue to the purchasers in denominations within the limits specified in Section 872, Revised Statutes. It can not be said, however, that the courts favor such practice, and they certainly do not encourage it. And if the evidence would disclose that the county and tax-payers were in any substantial respect prejudiced thereby it might be sufficient cause to hold such an issue of bonds illegal and void.

There is no evidence in this case that the bonds in question would have sold to any better advantage if they had been advertised and sold in denominations of one thousand dollars each, and no evidence that any substantial rights of the tax-payers suffered by the act of the commissioners in selling the bonds in the manner specified. The rights of the tax-payer as well as those of the holders of bonds, have frequently been presented to and determined by the courts of our state, and the proceedings of boards with statutory power to borrow money and issue bonds have been so frequently reviewed, that these questions are fairly well settled and defined in this state. Mere irregularities on the part of the commissioners, or the failure to observe certain preliminary steps presented by statute, which they may be sufficient to justify a court of equity in allowing an injunction prior to the sale and actual delivery of the bonds, yet such irregularities may not be in themselves of such material consequence as to justify an injunction after the sale and circulation of the bonds, and the rights of third parties have attached.

It is only in the above respect that municipal bonds may be said to possess the ingredients of negotiability. But where the legislative act under which the bonds are purported to be issued is unconstitutional, or where the board absolutely fails to comply

with essential requirements of the statutes, our courts have not hesitated to hold bonds so issued invalid and void, notwithstanding they may be circulated and in the hands of third parties.

In the case of *Hubbard* v. *Fitzsimmons,* 57 O. S., 436, the commissioners of Cuyahoga county issued and sold bonds for the purchase of a site and the erection of an armory in the city of Cleveland for the Ohio National Guards, under a legislative act purporting to confer full authority for so doing. The court held the legislative act unconstitutional because it was an attempt to make such general purpose the subject of a local imposition, and said:

"The case presents no reason why the purchaser of these bonds should be exempt from the familiar and salutory rule that one who relies upon the act of a public officer must take notice of the limits of his authority. The courts of this state have never encouraged confidence in the validity of acts of this character."

In *Wassen et al* v. *Commissioners,* 49 O. S., 622, where bonds were issued and circulated under an act purporting to authorize the same, but which act was held to be invalid, a similar ruling was held by the court.

In the case of *State, ex rel,* v. *Biddle,* 3 N. P., 173, which case counsel for plaintiff places special reliance, while it is not a case to enjoin the issue or payment of bonds, yet it embodies a similar principle of law, and seeks to enjoin payment for a bridge on the ground that the county commissioners did not observe the provisions of the statute in making the contract for the bridge and its erection.

The commissioners entered into a contract and purchased at private sale the bridge at a cost of $1,700. The statutes in force applicable to such a case absolutely required the commissioners to observe certain conditions, and to take certain preliminary steps, before a contract of that character for a public improvement, costing in excess of $1,000, could be executed.

They must first cause plans and specifications to be procured, and an estimate of the cost to be made according to Section 795, Revised Statutes. They must by resolution determine the length and width of the superstructure, whether the same shall be single or double track, and must advertise for furnishing the labor and material as required by Section 796, Revised Statutes. The plans

and specifications must be submitted to a joint meeting of the commissioners, county auditor and county surveyor, and must be approved by them according to Section 797, Revised Statutes. The commissioners must determine whether or not the cost of the bridge will exceed the sum of $1,000, as required by Section 798, Revised Statutes.

The contract must be submitted to the prosecuting attorney for his endorsement, which is indispensable in all such contracts exceeding in cost the sum of $1,000, as required by Section 799, Revised Statutes.

In the above case the commissioners observed none of the above requirements. They absolutely ignored each and every provision of law in the transaction, and made a private contract for the bridge. The court properly held the contract to be absolutely void, and there is no doubt but that if the commissioners had issued bonds in anticipation of payment for the bridge the court would have held the bonds invalid and void, even in the hands of third parties, and even if the holders thereof would have been deprived of any recourse for recovering satisfaction.

The above are a few of the many reported cases embodying this principle of law in this state, but I do not find it necessary here to review them in this connection.

There is no doubt as to the fact that the courts hold to a rigid compliance with statutory requirements, all boards having power conferred on them to levy taxes, make public contracts, and bond municipalities and counties for public improvements.

And all persons dealing with such boards must assume the responsibility of seeing to it that the boards act within the scope of their lawful authority, and comply with all the essential requirements of the statutes, otherwise they act at their peril, and are often left without recourse because of their failure to so investigate before entering into contracts.

Inasmuch as the evidence in the case at bar fails to show that the county has in any wise been prejudiced by the manner of selling and issuing the bonds in question, the court is not justified in granting the relief demanded on that ground.

The second ground of complaint is that the advertisement of the bond sale did not state the law or section of the law authorizing the issue.

This is required under the provisions of Section 22b of the statutes, and it is probable that a court of equity might have found such an omission sufficient ground for enjoining the advertisement and sale of the bonds if the relief had been demanded before the sale and circulation of the bonds. But inasmuch as it is only one omission of all other requirements of the statute which the board complied with, and the bonds having been sold and in the hands of numerous holders, and the money therefor paid into the treasury, and paid out in public improvements for the benefit of the county, it is too late to interpose that objection now, it not being of such material consequence as would justify the court in interfering on that ground under the above circumstances?

I have examined all the other proceedings of the commissioners in question, and all the authorities cited by counsel, and I do not find any irregularities in the proceeding of the board sufficient, at this time, to justify the relief demanded by the plaintiff in his first cause of action, and the same is therefore refused.

The third and fourth causes of action will be considered together. They are substantially the same, and involve the same facts and principles of law, except only that the former has reference to the proposed viaduct over the Pan Handle and B. & O. R. R. tracks on Cleveland avenue, or Harbor road, and the latter has reference to the viaduct over the N. & W. R. R. and C. A. & C. R. R. tracks on the same avenue.

The evidence and exhibits show that at a meeting of the commissioners held on June 1, 1902, a conference was had with representatives of the various railroads interested in a proposed project of tearing down the old bridges now used for public travel over said railroad tracks at the above points, and erecting instead thereof new structures. The county surveyor submitted plans prepared by him of the proposed viaducts at an estimated total cost of $65,000. A proposition was then made by the commissioners to said representatives that said steam railroads pay sixty-five per centum of said total cost, the remaining thirty-five per centum to be paid by the county and the Columbus Railway Company, which latter company proposed to operate an electric street railroad over said viaducts. The said representatives thereupon signified a willingness to accept said proposed terms on the part

of said steam railroads. And thereupon the commissioners adopted a resolution instructing the prosecuting attorney to prepare a contract between said railroads and the county on the basis of thirty-five per centum of said cost to be paid by the county, and sixty-five per centum thereof to be paid by said steam railroads. At a meeting of said board, held on July 2, 1902, resolutions were adopted by the unanimous vote of all the members declaring said old bridges over said railroad tracks to be in a dangerous condition and unfit for public travel, and that it was necessary, and was the intention of said commissioners to rebuild said bridges by removing the present wooden structures and erecting instead steel bridges with permanent floors and sandstone masonry substructure, and detailing the length and height thereof. Said resolution further recited that said steam railroad companies, and said street railway company shall bear in equal proportions and pay eighty per centum of the total cost of said structures, together with the cost of a temporary structure, all damages, etc., and that said Franklin county shall pay twenty per centum of all such costs; that twenty days' written notice of the passage of said resolution, and of the proposed building of said bridges be served upon the resident owners of property abutting upon said improvement, and that said resolutions be published for three consecutive weeks in a newspaper of general circulation in said Franklin county, Ohio.

The evidence further shows the three weeks' publication of said resolutions, the appointment of L. H. Cott by said board to serve notices on said property owners, and the verified report of said L. H. Cott, showing said service.

On August 4, 1902, said board of commissioners, being in session, adopted by the unanimous vote of all the members a resolution embodying the former resolutions, and the intention of the commissioners to proceed to rebuild and replace said old structures with steel bridges, permanent floors and sandstone masonry substructure; reciting the length, height, etc., of said bridges; that the steam and street railroads to pay eighty per centum of the total cost thereof, together with damages, etc.; the P., C., C. & St. L. Ry. Co., the B. & O. Ry. Co., and the Columbus Ry. Co. each to pay twenty-six and two-thirds per centum thereof, and Franklin county to pay twenty per centum thereof. The resolution

then provides for the time and manner of payment by said railroad companies, that said structures are to be erected according to plans and specifications prepared by the county surveyor, which are attached to and made a part of the resolution, and said work to be done under the supervision of the county surveyor. The resolution then provides that the commissioners are to retain control and supervision over said structures when completed, provides for the maintenance and repair of the same, and that the acceptance on the part of said railroad companies and the county should constitute an agreement between them under the provisions of Section 3337-10, Revised Statutes of Ohio. The estimated cost of the south structure is $41,690.80 and of the north structure is $29,-940.30. No other or further steps or proceedings have been taken by the commissioners in the premises, and all the above steps were taken at and before this suit was commenced.

The plaintiff complains that the board of commissioners has no lawful authority to construct said bridges, because, as he says in the petition, the emergency bridge fund of Franklin county is not sufficient to pay the county's portion for the construction thereof; and that the attempt of said commissioners to construct said bridges is illegal and void, because there is not sufficient funds in the county treasury, or levied and in process of collection, and unappropriated to pay for said bridges. He also avers that said bridges are not out of repair, and not in a dangerous condition for public travel, but that said bridges are in good condition of repair, and are safe for public travel, and are being used by the public and street car company continuously; that they are not burned down, nor washed away, nor been undermined, and that no emergency exists on account of any decay of said bridges, and that it is not the intention of the commissioners to restore said bridges for public accommodation, but to build new bridges; that said commissioners have heretofore permitted the Columbus Railway Company, a street railroad, to locate and maintain its tracks over said bridges, and that because said bridges are too narrow, the same are rendered inconvenient for horses and wagons by reason of the use of the same for said street cars, and that if the same were not used for said street cars the bridges would be ample and perfectly safe for public travel.

Plaintiff also complains that said bridges will cost more than $10,000 each, and that the policy of building the same has not been submitted to a vote of the electors of said county for their approval or disapproval, and that said board is attempting to and will build said bridges under the so-called bridge emergency law, when no emergency exists, unless restrained by this court.

He further complains that the commissioners made no provision in said agreement with the railroad companies for the maintenance and repair of said bridges after completion.

He complains that proper notice of the intention to erect said structures was not printed and circulated as provided by Section 877, Revised Statutes, and complains of the inadequacy of the apportionment of cost of construction thereof between the county and said railroads, and prays that the commissioners be enjoined from constructing said bridges over said railroad tracks.

The first inquiry of importance is to determine under what law or section of the statutes the commissioners are proceeding to erect these proposed bridges.

The evidence and exhibits show that the board is not proceeding under Section 2824, Revised Statutes, as claimed and argued by counsel for plaintiff. That section has reference to the levy of a special tax not exceeding one mill and five-tenths for an emergency fund, the proceeds of which are to be solely applied to the restoration of an important bridge belonging to or maintained by the county which has been destroyed or become dangerous to public travel by decay or otherwise. This section has reference to bridges, the sole maintenance of which devolves upon the county, and has no reference whatever to structures such as the bridges in question, the cost of erection and maintenance of which is apportioned between the county and other parties in interest.

The preliminary steps by the commissioners, and all the resolutions adopted, tend to show that it is not proposed to pay for this work out of the emergency fund, and on the other hand, they show that such proceedings are had under another legislative act, and the resolution of August 4, 1902, specifically refers to Section 3337-10, Revised Statutes, as authority that when said resolution is accepted by the parties in interest that the same shall constitute a contract.

The evidence shows that the commissioners are proceeding under the act of 1893, which act is now codified and known as Sections 3337-8 to 3337-17, inclusive, of the Revised Statutes of Ohio.

This act was passed for the purpose of authorizing city councils, boards of legislation, and county commissioners to join with railroad companies, and enter into contracts to abolish grade or other crossings and to apportion the cost thereof between such railroad companies and the county.

It provides the preliminary steps necessary to be taken by the commissioners. By provision of Section 2 thereof (3337-9) the board must by unanimous vote declare the necessity and intent of so doing, the manner and method of making the alterations and constructing the new crossing, the land or other property necessary to appropriate, how the cost shall be apportioned, by whom the work is to be done, and then provides that such resolution shall be published and notice of its passage given to owners of the property abutting on the proposed improvement in the manner provided in Section 2304, Revised Statutes, and all claims for damages by reason of such improvement must be filed in the manner and within the time provided by Section 2315, Revised Statutes. Section 3 thereof (3337-10) provides, that in not less than thirty nor more than ninety days after the passage of the resolution provided for in Section 2, that the commissioners shall determine whether they will proceed with the proposed improvement or not. If they decide to proceed they shall pass a resolution which shall contain, in addition to the terms and conditions stated in Section 2, the plans and specifications of the proposed alterations and improvement, also damages claimed or likely to accrue, how the cost of such improvement shall be apportioned, and who shall supervise the work.

Said section also provides that—

"Upon the acceptance of this resolution by the railroad companies through their directors, the same shall constitute an agreement which shall be valid and binding on the county and the railroad companies, and that such agreement shall be filed in the court of common pleas of the county in which the crossing is located, for entry upon the records thereof, and it shall have the same force and effect as a decree of the court."

Section 5 thereof (3337-12) provides—

"That the cost of construction, including cost of the land or property purchased or appropriated, and the payment of damages to abutting property shall be apportioned as follows: The railroad company or companies (if several railroads cross a public way at or near the same point) shall pay not less than sixty-five per centum of such cost, and the county shall pay not more than thirty-five per centum of such cost. Within these limits the apportionment may be fixed by the agreement under Section 3 hereof."

Section 6 thereof (3337-13) provides the manner of maintaining and keeping in repair the new structure, what portion the railroads shall maintain and keep in repair at their expense, and what part the county shall maintain and keep in repair.

Section 7 thereof (3337-14) provides—

"For the purpose of raising the money to pay the proportion of the cost of such improvement, payable by the county, the bonds of the county may be issued to the necessary amount, which bonds shall be of such denomination and payable at such place and times as the commissioners may determine, and shall bear interest not exceeding five per centum per annum, and shall not be sold for less than their par value. A tax on the taxable property of the county not exceeding one-half mill in each year may be levied to pay the principal and interest of the bonds as the same may mature. After the completion of the improvement, a tax may be levied by the county to pay the cost of maintaining and keeping in repair that part of the work required to be maintained and kept in repair by it."

The evidence before me shows that the commissioners have complied with the above provisions of the statutes in their proceedings so far as they have gone. They have let no contracts as yet for the work, and have not reached that stage. There is no evidence tending to prove that the commissioners propose, or are threatening to violate the law in their subsequent proceedings.

The evidence of Mr. Pinney, one of the commissioners, and that of Mr. Braun, the county surveyor, the latter of whom made a careful and critical examination of the present structures, show that the bridges are old and dangerous, and that they are liable at any time to collapse under heavy loads. I think his evidence disputes the claim of plaintiff that the only purpose of the com-

missioners is to dispose of the old structures because they are too narrow to accommodate both the street cars and public travel. The latter may, and no doubt is, the purpose in part, but aside from that the evidence is conclusive to show that the bridges are so old and decayed and so dangerous that they are liable to fall under heavy loaded street cars, or wagons, at any time. And the fact that the commissioners have had notice of their dangerous condition for several years, and should have replaced them long ago, is no reason for not doing so now, as plaintiff claims, but, on the other hand, the fact that the commissioners have such notice affords a stronger reason for replacing said bridges without further delay, in order to avoid probable liabilities for damages to persons and property for which the county may be compelled to respond by reason of the fact of such knowledge being shown.

The publication of the resolution and the notice here has no application to Section 877, Revised Statutes, as claimed by plaintiff. Section 2304, Revised Statutes, is the governing section, which is specially referred to and made such by Section 3337-9, Revised Statutes. And the evidence shows that the commissioners have fully complied with that section.

Plaintiff also complains because the policy of erecting these viaducts has not been submitted to a vote of the electors of the county, on the ground that they are to cost more than $10,000 each.

In view of the fact that the evidence before me fails to show that said structures will cost the county more than $10,000 each, as a matter of law, the question as to whether or not an improvement in any sum under the legislative act in question requires the proposition to be submitted to a vote of the electors, is not properly before me in this case.

Eighty per cent. of the entire cost of these structures, the evidence shows, is to be paid by the railroad companies, and only twenty per cent. thereof is to be paid by the county.

The total cost of one of said bridges is $41,690.80. Twenty per cent. of that sum is $8,338.36, being the total portion to be paid by the county. The total cost of the other bridge is $29,940.30; the county's entire portion thereof will be $5,980.06. In each instance the county's portion is less than $10,000. I will say, however, that this legislative act seems to be complete in

itself, and has no application to, nor has to be read, in connection with other sections of the statutes, except in the particulars in which other sections of the statutes are therein specially referred to. For instance, Section 7 of the act (3337-14), the section providing for bonding the county and levying the tax, is exclusive in its scope, and specifically provides the manner of raising the money for paying for such improvements. There is no limitation as to the cost. It provides that the bonds may be issued to any *necessary amount,* and it is without any reference whatever to submitting the question to a vote of the electors, or in any wise, requiring such to be done with reference to any provision of law, other than according to the provisions of that legislative act.

Plaintiff also complains that the railroad companies have not signed the contract, and that there is no provision in the resolution for said companies contributing their portion of the cost of maintenance and repairs.

The first part of this complaint assumes that the commissioners will proceed with the work without the railroad companies first agreeing to the contract. There is no evidence before me that the commissioners are proposing or threatening to so do. The court can not, in the absence of evidence, act on an assumption.

As to the latter part of the complaint. In the first place, the resolution does make provision for each party's proportionate part of the cost of maintaining and keeping the structures in repair. And even if it did not, the statute itself provides for such, and is so drastic in its penalty as to direct the court on application to enjoin the companies from using the tracks and operating the railroads under the structures, until they comply with any order and decree of the court required of them under the provisions of that act.

The only remaining question necessary to consider is as to whether or not the commissioners have failed to comply with the law in apportioning the cost between the railroad companies and the county.

The statute provides that the railroad companies shall pay not less than sixty-five per cent. of the cost, and the county shall pay not more than thirty-five per cent.

The evidence shows that the commissioners have resolved, and propose to enter into a contract that the steam railroads and the street railroad shall together pay eighty per cent. of the cost, thereby leaving the county to pay twenty per cent. of the cost.

But plaintiff complains that because of some arrangement between the steam railroads and the street railroad, which they have had the commissioners incorporate in ·the proposed contract, whereby the steam roads and the street railway are to equally apportion and pay said eighty per cent. of the cost, making twenty-six and two-thirds per cent. for each of said roads to pay, and because the contract does not show and require that the steam roads pay alone sixty-five per cent. of the cost, that therefore the proposed contract arrangements are illegal and void.

The objection goes to form rather than to substance. What matters it to the tax-payers of the county what portion of the eighty per cent. each road pays? The effect of the contract is that not only the sixty-five per cent., required by statute, is paid by the railroads, but in addition, the contract carries out the evident purpose of the commissioners to require the street railroad to pay at least fifteen per cent. of the cost, thereby decreasing the county's portion to twenty per cent., instead of thirty-five per cent., as provided by statute.

If, for any cause, the street railroad desires to enter into a contract with the steam railroads to relieve the latter from a part of their burden and to increase its own, that is no concern of the tax-payers, and they can not complain. So long as the fact remains, as the evidence shows, that the county does not agree to pay more than the law authorizes it to pay, the rights of the tax-payers are not prejudiced.

For the above reasons I find that the plaintiff is not entitled to the relief prayed for in his third and fourth causes of action.

It is therefore ordered that the petition be dismissed at plaintiff's costs.

*M. E. Thrailkill,* for plaintiff.

*Taylor, Seymour & Webber,* for defendants.